IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION


SOUTHERN CLUB ENTERPRISES,
INC. and 250 CENTRAL AVENUE, LLC                    PLAINTIFFS


vs.                    Case No. 6:11-6013


UNITED STATES OF AMERICA                           DEFENDANT


## MEMORANDUM OPINION AND ORDER

This matter is before the Court for decision following a two-day trial to the Court beginning on May 22, 2012, in Hot Springs. Also before the court are the parties' post-trial briefs. (Docs. 23, 25). Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court enters the following Findings of Fact and Conclusions of Law, based upon consideration of the admissible evidence and the Court's assessment of the credibility of the trial witnesses.

### Findings of Fact

During the trial, the following facts were established by a preponderance of the evidence:

1.  Plaintiffs are domestic entities of the state of Arkansas which own and operate the Josephine Tussaud Wax Museum located on Central Avenue in Hot Springs, Arkansas. The Wax Museum is

adjacent to West Mountain, which is in the Hot Springs National Park.

2.    West Mountain is steep and rugged, and has an underground storm drain system consisting of culverts with intermittent intakes, which are also known as clean-out boxes or inverts. Defendant, acting through the United States Department of the Interior and the National Park Service, owns and maintains the surface water collection system, which is designed to transport water down the mountain and into the drainage system of the City of Hot Springs.

3.    One of the culverts, an 18 inch underground tube, is located immediately behind and steeply uphill from the Wax Museum.  The culvert is designed to send water into Hot Springs Creek at or near Central Avenue.  This particular culvert has four manholes or inverts which allow surface access to the underground culvert for maintenance.

4.    At some point prior to May 5, 2009, soil and natural debris accumulated in the underground culvert near the final, or lowest, manhole.  The accumulation fully obstructed the culvert, completely blocking the exit of water at the termination of the culvert near Central Avenue.

5.    On May 5 and 6, 2009, the Hot Springs area experienced rainfall ranging from .07 inches to 3.84 inches during a 24-hour period.

6.   During the May 5-6 rain event, water which entered the system backed up, lifting the cover off the next uphill manhole. The water then exited the system, but uphill of the designed location.   The manhole where the water exited the system was immediately uphill from the Wax Museum.   All the water that entered the culvert exited the system through the manhole uphill from the Wax Museum, instead of the designed exit, and poured downhill directly into the Wax Museum.

7.   Water ran into the Wax Museum for approximately nine hours, causing damage to real and personal property.

8.   Upon being advised of the flooding occurring at the Wax Museum, on the early morning of May 6, 2009, Park employees went to the area on West Mountain above the Wax Museum.   They discovered that one of the clean-out boxes in the storm drain system was clogged due to debris, and water was exiting the system from the top of the clean-out box.

9.   National Park Service personnel called City of Hot Springs personnel to use their equipment to "flush" the system.   Once the system was flushed the clogged material was pushed through the system, and the water began properly flowing through the drainage system and no longer exiting out the top of the clean-out box.

10.  Defendant owned and occupied land immediately adjacent to Plaintiffs' land.

11. Plaintiffs submitted an administrative claim in the amount of $625,419.84.

**Discussion**

**1. Federal Tort Claims Act**

The United States "can be sued only to the extent that it has waived its immunity." *United States v. Orleans,* 425 U.S. 807, 814 (1976). The Federal Tort Claims Act ("FTCA") waives the federal government's immunity from suit for a discrete class of lawsuits. 28 U.S.C. §§ 2671-80 (2005). This waiver, however, is limited by the discretionary function exception, precluding "[a]ny claim based upon an act or omission of an employee of the Government ... based upon ... a discretionary function or duty." 28 U.S.C. § 2680(a). The Supreme Court has established a two-part test for application of the discretionary function exception. *See Berkovitz v. United States,* 486 U.S. 531, 536-37 (1988).

First, courts inquire as to whether the challenged action was discretionary, as opposed to being governed by mandatory statute, policy, or regulation. *Whisnant v. United States,* 400 F.3d 1177, 1180-81 (9th Cir. 2005) (summarizing *Berkovitz* test). Second, if the court finds the action to have been discretionary, it then determines whether the action involved "a decision susceptible to social, economic, or political policy analysis." *Id.* at 1181; *see also O'Toole v. United States,* 295

F.3d 1029, 1033-34 (9th Cir. 2002). If the challenged action was both discretionary and policy driven, the discretionary function exception bars FTCA claims.

The parties disagree as to the existence of a mandatory policy regarding maintenance of the culvert system on West Mountain. At trial, Plaintiffs submitted into evidence four documents entitled "Job Plan Operation Detail". These documents are a part of the Defendant's Facility Management Software System. Each reflects a job plan and the frequency, description, duration, labor, materials and tools necessary for that particular job.

- Job Plan 42598--Internal Cleaning and Monitoring Culverts Monthly--clear debris from entrance and exit of culverts; internal cleaning with flushing machine, if needed; inside inspection with use of camera, If needed; note damages. (Plaintiffs' Ex. 3).
- Job Plan 42603--Inspect Road for Debris Weekly--clear debris (fallen rocks, trees or limbs) from roadway; clear debris from gutters; visually inspect drop inlets for debris; note damages. (Plaintiffs' Ex. 4).
- Job Plan 19306--Internal Cleaning and Monitoring Culverts-- clear debris from entrance and exit of culverts; internal cleaning with flushing machine; inside inspection with use of camera; note damages. (Plaintiffs' Ex. 5).
- Job Plan 1195--CA Roads Inspection[1]--storm sewer piping (this includes installation of piping for collection of storm water); storm sewer manholes (this includes construction, maintenance and installation of manholes for storm water collection systems); culverts (this includes construction, maintenance and installation of culverts for storm water systems); headwalls and catch basins (this includes construction/maintenance of headwalls and

---

[1] The CA (Condition Assessment) is an annual inspection. The job plan also includes provisions for road inspection and maintenance that are not relevant here.

installation/maintenance of catch basins for storm water systems). (Plaintiffs' Ex. 6).

The first two Job Plans appear to dictate that the Park maintenance staff is required to inspect and clear debris on a monthly basis. Hot Springs National Park Superintendent Mardi Arce testified that she is responsible for maintaining the day to day operations of the park and directly supervises the Park's five division chiefs. (Trial Transcript P. 287, Line 10-15). On May 6, 2009, Ms. Arce was in charge of the Park's response to the flooding event at the Wax Museum. Ms. Arce testified that she produced the above Job Plans in response to the Plaintiffs' request for the production of "any and all writings of any kind which specifically or in any manner set out any maintenance practice and procedures of the storm drain system and inverts which are the subject of this litigation." (Trial Transcript P. 298-299). Ms. Arce testified that these policies were not in effect on May 6, 2009. (Trial Transcript P. 301, Line 23).

The evidence reflects that at the time of the flooding event at the Wax Museum, no policy existed for regular maintenance of the Park's storm water system, other than as part of the yearly condition assessment of the Park. Since the Park's course of conduct is not mandated by statute, regulation or its own policy, Defendant would have to demonstrate that the government actions at issue are of the nature and quality that

Congress intended to shield from tort liability. However, Plaintiffs' lawsuit involves a mundane question of routine ditch maintenance. The Eighth Circuit has consistently held that the FTCA applies to decisions by federal agencies at the "operational" level, but that decisions on the "policy or planning" level are exempt. *E. Ritter & Company v. Department of the Army, Corps of Engineers*, 874 F.2d 1236, 1241 (8th Cir. 1989)(*citing In re Estate of Gleason v. United States*, 857 F.2d 1208, 1209 (8th Cir. 1988)(finding that the Corps had a responsibility of maintaining the Riverdale Outlet Ditch, as designed and constructed; proper maintenance of the ditch would have prevented erosion). This is not a decision grounded in social, economic or political policies, and as such it is not the sort of public policy issue that the discretionary function exception is designed to protect. *See O'Toole v. United States of America*, 195 F.3d 1029 (9th Cir. 2002)(reversing district court's dismissal for lack of jurisdiction where Bureau of Indian Affair's decision to allow an irrigation system to fall into disrepair caused damage to neighboring landowners). Because the Park's storm water management system maintenance was discretionary but not policy driven, the discretionary function exception does not bar Plaintiffs' FTCA claims.

## 2.  Negligence

Under the FTCA, the standard of liability for the government is the same as that for a private person, the prudent person standard. *Ritter* at 1241. In Arkansas, the failure to do what a person of ordinary prudence would do under the same or similar circumstances constitutes negligence. *Id.* at 1242.

The essential elements of a cause of action for negligence are that the Plaintiff demonstrate a duty owed and a duty breached, and that the Defendant's negligence was a proximate cause of the Plaintiffs' damages. *Scott v. Cent. Ark. Nursing Ctrs., Inc.,* 101 Ark.App. 424, 434 (2008). Proximate cause is generally a question of fact, unless the evidence is such that reasonable minds cannot differ. Proximate cause is defined, for negligence purposes, as that which in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred. *Wal-Mart Stores, Inc. v. Kilgore,* 85 Ark. App. 231, 236-237 (2004).

DUTY

Pursuant to Arkansas law, it is the duty of a land owner to protect another nearby land owner from damages resulting from a structure or artificial condition maintained on their land if the land owner knew or should have known of an unreasonable danger created by that structure and the land owner knew or

should have known that the danger existed without the consent of those affected by it and the land owner fails, after having a reasonable opportunity, to eliminate the danger or otherwise protect against it[2].   AMI 1110; Restatement Second of Torts § 366; *Dye v. Burdick*, 262 Ark. 124 (1977).   The National Park Service has a duty to operate and maintain the drainage system into which they intentionally divert storm water and for which it has accepted the responsibility for operation and maintenance.

BREACH

The question of the breach of that duty is the manner in which the Park maintained its storm water drainage system on West Mountain, which was the subject of varied testimony at trial.   Beginning with the testimony of National Park Service Engineering Equipment Operator Walter Abbott, the answers were difficult to follow, with the matter becoming less clear as the trial went on.   Mr. Abbott testified that as an employee of the Roads and Trails department, he was the person responsible for maintenance of the gutter and culvert system. (Trial Transcript P. 234, Lines 9-22).

On direct examination, after explaining how the gutter and culvert system on West Mountain works, Mr. Abbott was taken through the Job Plans, identified as Plaintiffs' Exhibits 3 and

---

[2] Plaintiffs argue that they are entitled to an inference of negligence by *res ipsa loquitur*.   The Court does not address that claim here.

4.   Mr. Abbott testified that on a weekly basis, his department clears debris from the road and gutters, visually inspects drop inlets for debris and notes any damage to the system.  (Trial Transcript P. 240, Lines 8-19).  Mr. Abbott earlier testified in his deposition that he inspected the cleanout boxes annually, producing pages from his calendar showing he had performed an inspection on January 7 and 8, 2009.  (Trial Transcript P. 244, Lines 12-17; Plaintiffs' Ex. 13).  At trial, Abbot testified that the January 7 and 8 inspection was in performance of the annual condition assessment, but that monthly visual inspections of the cleanout boxes also occur.  (Trial Transcript P. 243, Lines 16-22).

Calendar pages produced by Mr. Abbott reflect that he had inspected the boxes only once in 2009 prior to the overflow, but his testimony in court was that he performed the inspections monthly as well as in compliance with the required annual assessment, a total of 13 times per year.  Mr. Abbot said the inspection 13 times per year was the way he *currently* maintains the system.  On Re-Cross Examination, Mr. Abbott testified that at the time of the overflow in 2009, it was his department's practice to check the cleanout boxes and drop inlets three to four times a year and following a large rain event, if necessary.  (Trial Transcript P. 274, Lines 5-12).  Mr. Abbott's supervisor, Park Deputy Superintendent Mardi Arce, testified

that the weekly and monthly inspection plans (Plaintiffs' Ex. 3-6) that the Park produced in discovery were not established until (and in reaction to) the overflow into the Wax Museum in 2009.

Regardless of whether in 2009 Mr. Abbott inspected the system annually, monthly or even daily, it is obvious that he could not have viewed more than 10% of the culvert at any given time: "We open up the cleanout boxes and then take a flashlight and look up and down each culvert, see if there's anything and make sure there's nothing inside the cleanout boxes or any obstruction inside the culverts." (Trial Transcript P. 244, Lines 22-25). Mr. Abbott testified that the distance between the two cleanout boxes at issue on West Mountain was 120 feet, but that he could only see some 20 feet in either direction with his flashlight. (Trial Transcript P. 245, Lines 11-14). The culvert system had only been flushed one time, in 1998. (Trial Transcript P. 247, Lines 5-8). Contrary to reports at the time of the 2009 overflow, Mr. Abbott testified that the National Park Service had never used video camera equipment to view and record the inside of the system. (Trial Transcript P. 249, Lines 16-18). Although there was a plan to video the culverts on West Mountain in 2006, using the City of Hot Springs' equipment, the operator, according to Mr. Abbott, believed that this particular culvert was too steep to utilize this procedure.

(Trial Transcript P. 257-258).   The National Park Service owned a flushing machine, but it was stated to be not as powerful as the one owned by the City of Hot Springs, which was the one used to flush out the debris that caused the 2009 overflow.   (Trial Transcript P.249, Lines 7-8).   Mr. Abbott testified that when he had been trained to inspect the culverts, he was taught to keep them cleaned out.   (Trial Transcript P. 259, Lines 21-23).

Mr. Abbott testified that on the morning of May 6, 2009, when he arrived at the Wax Museum he saw a "small waterfall" coming down the side of the mountain.   (Trial Transcript P. 262, Lines 13-14).   Before going up to inspect it, he knew the culvert was obstructed.   (Trial Transcript P. 250, Lines 20-25). Although Mr. Abbott's testimony was at times confusing, it is clear that the National Park Service did not have in place at the time of the overflow adequate tools with which to maintain the storm water system and prevent incidents such as the one that damaged the Wax Museum.   This is borne out by the conclusion of the Government's expert witness, Dr. Nolan Raphelt, Ph.D in his report and trial testimony[3].   Dr. Raphelt had been a hydraulic engineer for 40 years, and his firm, Pyburn & Odom, Inc., was commissioned to perform an evaluation of the hydrologic and hydraulic impacts of the May 5-6, 2009, rainfall

---

[3] Dr. Raphelt was not available at trial, and his testimony was taken in the form of a videotaped deposition on June 26, 2012, a copy of which was provided to the Court.

event on the flooding of the Wax Museum.  (Plaintiffs' Ex. 25).
In his written report he concluded that there was an

> extremely intense rainfall event [on May 5-6] that had
> a frequency of occurrence of between once in 50 and
> 100 years, or an extremely rare event.... Most modern
> storm drainage systems would not have been capable of
> handling such a rare event.  Hydraulic and hydrologic
> computations of the storm drain system indicated that
> the existing storm water drainage system has the
> capacity to convey the flows experienced on May 5 and
> 6 2011 [sic] to City of Hot Springs storm water
> drainage system.

(Plaintiffs' Ex. 25, Pgs 21-22).  Dr. Raphelt testified that the
drain system maintained by the National Park Service has
adequate minimum flow velocities to move water and that it was
designed to be self-cleaning.  (Raphelt's Deposition P. 31,
Lines 11-13; P. 32, Line 6).  Dr. Raphelt and other members of
his firm studied rain gauge data from May 5-6 and physical
survey data of the storm drain system and concluded that the
system was adequately designed to handle all the flows that
would enter into the system back in 2009.  (Raphelt's Deposition
P. 11, Lines 9-22; P. 12, Lines 12-13).  Dr. Raphelt testified
that the way the system was set up on May 5-6 was adequate to
carry the flow that entered in it from Manhole 4.  (Raphelt's
Deposition P. 43, Lines 15-24).  "The conclusions we drew was
if the system hadn't stopped up, that it was--the system should
have worked okay.  It was adequately designed, the... plug did
change the hydraulics and the flow characteristics and the

location of... where some water were discharged." (Raphelt's Deposition P. 12, Lines 1-6).

Dr. Raphelt later testified, "The intensity of this rainfall was far greater than the system is designed to handle...this was a rainfall that was about...what you get once in every 50 years. So it was a high-intensity, gully washing.... And it just does not appear that the system could handle it." (Raphelt's Deposition Pgs. 48-49). Dr. Raphelt also testified that he had no experience in any sort of culvert system or municipal surface water draining system. (Raphelt's Deposition P. 38, Lines 1-4). Dr. Raphelt was asked to read from page 6 of his report, in which he stated:

> The total rainfall of the May 5-6 2009 storm in Hot Springs would not be considered a major event using Technical Paper 40, Rainfall Frequency Atlas of the United States for Durations from 30 Minutes to 24 Hours and Return Periods from 1 to 100 Years (1961). The total event would be considered a 2 year frequency 12 hour Rainfall event. The total precipitation for this event is often experienced in the Hot Springs area, however this event did have the potential to cause flooding because of the very intense 5 and 15 minutes rainfall events that occurred between 12:30 a.m. and 1:00 a.m. on the morning of May 6, 2009.

(Plaintiffs' Ex. 25, P. 6).

The amount of rain that fell that morning continues to be the subject of debate. While Dr. Raphelt examined data from seven rain gauges, he admitted that none of the gauges showed the amount of rainfall in the watershed that fed into the

culvert, which would have impacted the Wax Museum.  Instead, he relied on five of the seven gauges to determine the intensity of the rainfall; specifically, he did not consider the two gauges closest to the Wax Museum and based his conclusion on the gauge located farthest from the Wax Museum, which, coincidentally, reported substantially more rainfall than any of the other gauges. (Raphelt's Deposition Pgs 68-69).  Dr. Raphelt admitted that even with a reduced amount of rainfall, the flow entering would have been more than the culvert could handle." (Raphelt's Deposition P. 73, Lines 5-9).  Regardless of the conflicting rainfall data relied upon, Dr. Raphelt's testimony did not dispute that the cause of the overflow was the clogged culvert. "Nothing in my study indicated that the clog was there or wasn't there.  I didn't have any way of evaluating how the clog occurred." (Raphelt's Deposition P. 39, Lines 15-18).

## Proximate Cause

Defendant does not deny that Plaintiffs' property was damaged as a result of its clogged drainage system.  On Cross-Examination, Deputy Park Superintendent Mardi Arce testified that the culvert was clogged:

The Court:  Is there any question in your mind but that the manhole that we are looking at now was clogged on the date of the occurrence?

Arce:          Well, the---I have no doubt in my mind that the culvert that runs in between this manhole and the next manhole was clogged somewhere.   (Trial Transcript P. 311, Lines 8-13).

The Court:     But did your investigation reveal that there was a substantial blockage in the culvert on the day of the occurrence?

Arce:          Yes....Yes, I -- there was water that was created from that backing up." (Trial Transcript P. 312, Lines 1-10).

U.S. Attorney: But it was obvious to you, Ms. Arce...that the water had flowed out of this and down the hill...over to the wax museum?

Arce:          Right.  (Trial Transcript P. 313, Lines 8-14).

**Conclusions of Law**

1.   The Court has jurisdiction pursuant to 28 U.S.C. § 1346(b), and venue is proper pursuant to 28 U.S.C. § 1402(b).  Plaintiffs commenced this action within the time and in the manner set forth under the terms of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 1402(b), 2401(b) and 28 C.F.R. 14.9(a).

2.   The law of the state of Arkansas is applied to a determination of negligence and the amount of damages.

3.   Pursuant to Arkansas law, it is the duty of a land owner to protect an adjoining land owner from damages resulting from a structure or artificial condition maintained on their land if

the land owner knew or should have known that the danger existed without the consent of those affected by it and the land owner fails, after having a reasonable opportunity, to eliminate the danger or otherwise protect against it.  A violation of the duty is negligence.  AMI 1110; Restatement Second of Torts § 366; *Aluminum Company of America v. Guthrie*, 296 Ark. 269 (1988); *Try B Advertising v. Thomas*, 278 Ark. 58 (1982); *Dye v. Burdick*, 262 Ark. 124 (1977).

4.  Defendant failed to use ordinary care in the inspection and maintenance of its underground surface water drainage system.

5.  Plaintiffs proved by a preponderance of the evidence that they sustained damages, that Defendant was negligent in maintaining its underground surface water drainage system, and that Defendant's negligence was a proximate cause of Plaintiffs' damages.

6.  Plaintiffs' damages are limited by the damages proven in connection with their administrative claim.  For the reasons set out below, Plaintiffs are entitled to recover $145,472.60.

**Damages**

On the morning of May 6, 2009, in addition to alerting the National Park Service that the Wax Museum had flooded, Plaintiffs filed a flood loss claim with their insurance company, "National Flood Insurance Program," serviced locally by First Arkansas Insurance of Hot Springs Inc.  A representative

visited the site and determined it was "evident the damage was caused by failure of drainage systems on the adjoining property." (Plaintiffs' Ex. 29, P. 1). The representative, Adam Jones, informed Plaintiffs that because the flooding was limited to their property it was not the result of a "General Condition of Flooding," and was not covered by the National Flood Policy. Upon learning this, Plaintiffs hired Mr. Jones to consult as a private adjuster. In addition, Plaintiffs engaged B&F Engineering, Inc. to perform a storm water runoff damage assessment[4]. Tim Tieaski, P.E., visited the Wax Museum on May 6, and June 16, 2009, and his engineering firm performed a topographic survey to determine how much debris washed down the embankment into the Wax Museum's back yard. (Plaintiffs' Ex. 27).

Mr. Jones completed a thorough review of the real and personal property and presented a comprehensive plan of remediation efforts (based in part on B & F Engineering's proposal). The total actual cash value of the loss was estimated to be $625,419.84[5], and this was the amount Plaintiffs used in making their administrative claim.

---

[4] Mr. Roberts testified that Mr. Jones suggested he engage an engineer. (Trial Transcript P. 65, Lns 4-6).
[5] Although Defendant contends that it was not negligent in its maintenance of the storm water system and is not liable for any damages to Plaintiffs, Defendant also argues that Plaintiffs have failed to prove damages in the amount claimed. Defendant proffers that at least $440,850.53 should be deducted from Plaintiffs claim, for a maximum award of $184,569.31. (Doc. 25).

Remediation

Mr. Tieaskie's report indicates that when the embankment behind and above the Wax Museum collapsed due to the drainage system overflow, the swiftly-moving water carried and eventually deposited approximately 114 cubic yards[6] of loose soil material, shale and organics at the back of the Wax Museum. (Plaintiffs' Ex. 27, P. 3).   Mr. Tieaskie testified that the slope had sloughed off, washing soil, small rocks, gravel, leaves and limbs down the hill.   (Trial Transcript P. 111, Lines 12-16). In addition, the water that flowed down the embankment undermined the structural integrity of the concrete slab at the top of the embankment at the point of the overflow.   (Trial Transcript P. 111, Lines 16-20).   In Mr. Tieaskie's opinion, the accumulated debris must be removed and the embankment, including the concrete slab, stabilized in order to prevent additional future damage to the Wax Museum building and property.   (Trial Transcript P. 118, Lines 3-25).

To determine the costs of such remediation, three engineers from B&F Engineering, Inc. and two local contractors worked

_____

[6] Mr. Tieaskie testified that the survey crew performed "shoot shots" from the rooftop of a building adjacent to the Wax Museum.  "We have an instrument man that takes a rod with a prism on it that indicates a location and height and it gets shot into an instrument.  That data is duplicated throughout the area of the debris from the base up to the top.  And then it is compiled in a program.  At that time we used a program called Eagle Point which compiles those points and generates contours which each contour is--everybody is probably familiar with but represents a foot in height change of elevation. So through that data then we were able to generate the approximate location of the base of the mountain before the debris and generate some cross sections and do a volume calculation."  (Trial Transcript P. 116, Lns 5-19).

together to develop an estimate. (Trial Transcript P. 119, Lines 22-25). Costs factored into B&F's report included those for excavating material and reinforcing the slope. (Trial Transcript P. 120, Lines 6-11). The first estimate was based on constructing a temporary gravel road on National Park Service land and accessing the material from above utilizing a crane with a bucket. The second option was to remove an existing masonry wall from behind the building to create a path and excavate the debris by hand, bringing the material through the building to Central Avenue using wheelbarrows. (Plaintiffs' Ex. 27, P. 4). The estimated construction cost of excavation from the upper side of West Mountain was $202,381.43 and the estimate of excavation from Central Avenue was $200,419.53[7]. (Plaintiffs' Ex. 27, P. 18).

Mr. Tieaski testified that the costs of remediation included in his report were necessary and reasonable as of 2009, but that the costs would have risen since that time. (Trial Transcript P. 122, Lines 16-18).

Despite the thoroughness of B&F's calculations and report, there is no way of determining with any certainty how much debris was deposited in the back of the Wax Museum as a result

---

[7] Mr. Tieaski testified that the lower estimate for excavating from Central Avenue was used in Mr. Jones' adjustment, but according to his report, Mr. Jones used the higher of the two estimates. (Trial Transcript P. 122, Lns 1-77; *but see* Plaintiffs' Ex. 29, P. 36). Mr. Jones also based his commission on the higher of the two estimates, *see infra.*

of the over-flowing drainage pipe.   No evidence was produced showing the condition of the property before May 6, 2009.   Mr. Abbott testified that the vegetation he witnessed behind the building was growing in the ground, not lying on the ground as if it had come to rest there recently.   (Trial Transcript P. 268, Lines 4-8).   The Wax Museum had flooded at least once before, in 1990, when the area received 13.25 inches of rain in less than 24 hours, causing floodwaters 2 to 4 feet to flow through the historic downtown area of Hot Springs[8].   In 1986, the Wax Museum's then-owner Al Green told the Governor's Commission on Hot Springs National Park that his business frequently suffered damage when heavy rains fell on the city[9].   (Defendant's Ex. 29).   Without any evidence that all the debris behind the Wax Museum was deposited as a result of the May 6, 2009, overflow, or that the event caused all of the cliff erosion, it would be inappropriate to award Plaintiffs the full measure of remediation expenses.   Due to the history of the area, it is more likely than not that the embankment had eroded over a period of time due to conditions outside the National Park Service's control and that the area behind the Wax Museum contained debris from past flooding.   Defendant argues that the

---

[8] USGS, " Hydrologic Monitoring for the City of Hot Springs Early Flood Warning Information System",
http://ar.water.usgs.gov/PROJECTS/HotSpringsFlood.html, site visited July 25, 2012.
[9] Roger Hedges, The Sentinel-Record, Hot Springs, Arkansas, "Panel Tries To Turn Tide Against Downtown Flooding," June 13, 1986.

total amount claimed for soil remediation and engineer fees in the amount of $218,571.94, should be deducted from any award of damages. (Doc. 25, P. 11).

Under Arkansas law, the measure of damages is the cost of restoring property to its former condition. *Barnes v. Young,* 238 Ark. 484 (1964). The Court finds the total estimated cost of remediation to be supported by the evidence, but that it should be reduced by 50% to account only for damages that were proximately caused by any negligence of Defendant, as opposed to damage attributable to erosion over time or other conditions such as historical flooding or cutting back of the mountain by current or past property owners. The Court awards Plaintiffs $101,190.72 for remediation and believes this to be fair and equitable under the circumstances.

<u>Building</u>

Mr. Jones testified he used Simsol software, one of two programs approved by the National Flood Insurance Program and widely used by adjustors to estimate flood loss. (Trial Transcript P. 183, Lines 16-18; P. 185, Lines 10-16). After he determined there had in fact been flood damage, he entered the building's measurements and construction material into the program, which assigned value based on the Craftsman Publishing database. That database is updated quarterly and generates claim data for any type of property loss based upon construction

prices for a specific trade--according to zip code. (Trial
Transcript P. 183, Lines 6-11; P. 184, Lines 1-2). According to
the Simsol program, heavy flood loss clean-up was valued at $.98
per square foot in Hot Springs, Arkansas in May of 2009.
Mildewcite floor treatment was valued at $.23 per square foot;
pressure blasting concrete floor was valued at $2.12 per square
foot, etc. (Plaintiff's Ex. 29, P. 10). While this method of
itemizing claims may be useful in the insurance world for its
uniformity and predictability, it bears little resemblance to
the damages actually sustained by Plaintiffs in this case.
Further, it is the finder of fact's obligation to assess damages
by fixing the amount of money which will reasonably and fairly
compensate Plaintiffs for the damages they sustained. (AMI 2201
Measure of Damages--General Instruction).

    Using the Simsol software, Mr. Jones estimated the
replacement value of the building itself to be $1,146,376.00, or
$93.05 per square foot. After applying 37% depreciation, the
actual cash value of the building is $722,216.88, or $58.62 per
square foot, according to Mr. Jones. (Plaintiffs' Ex. 29, P.
9).

    Mr. Jones' plan provided for the room-by-room costs of
removing mud and water from the building, replacing damaged
floor coverings, trim and framing, drywall, paint, mold-
treatment of surfaces, repairing water heater and escalator,

replacing custom cabinetry, electrical outlets and the heating and air conditioning system, all of which were alleged to have been damaged by the flood.  Mr. Jones estimated the cost to restore the building to pre-flood condition and remediate the area behind the building and the cliff face to be $407,426.17. He then added ten percent adjustment for contractor overhead and ten percent for contractor profit, totaling $81,485.24. Next, he added the cost of debris removal and haul-off to be $16,297.05, for a total of $505,208.46. Mr. Jones accounted for depreciation[10] of $26,222.94, resulting in actual cash value of $478,985.52, including his commission[11] of $36,769.17.  This figure represents "heavy flood loss clean-up", Mildewcide floor treatment, air movers and dehydrators, pressure blasting floors, cleaning, treating and sealing walls, removing and replacing wall plaster, painting walls, removing and replacing shelving, doors, hardware for each room and flushing and sanitizing the

---

[10] Mr. Jones testified that he applied an "educated estimate" to depreciate the cost of restoring the building and its contents.  He did not apply any depreciation to personal property which had not been used at the time of the overflow (display and sale items in the gift shop).  (Trial Transcript P. 203, Lns 2-13).

[11] Mr. Jones included an 8% commission for himself based on the gross loss, which is the cost of repair before depreciation.  The National Flood Insurance Program limits adjustors to the higher of 2.1% or $5,750 for claims above $250,000.01 with dates of loss on or after September 1, 2008. NFIP Adjuster Fee Schedule-2008 Revision, http://www.fema.gov/library/viewRecord.do?id=3895, site visited August 7, 2012.

H.V.A.C., in addition to specific repairs, cleaning and replacement needed for each individual-purpose room[12].

Owner Stacy Roberts testified that the HVAC unit was damaged by floodwater, catching fire and resulting in total destruction of the unit. The Wax Museum was closed for three to four days for cleaning and other flood-related maintenance. (Trial Transcript P. 67, Lines 12-19). The floors were damaged and, although Mr. Roberts testified he had patched places over time, they still need to be replaced. (Trial Transcript P. 68, Lines 4-18). The damaged walls were power washed and treated for fungus, but some of them had to be removed altogether. (Trial Transcript P. 69, Lines 3-16). The electricity had to be rewired in many places due to water damage. (Trial Transcript P. 70, Lines 12-17). Mud had to be scooped from the basement and there was up to 16 inches of water in much of the building. (Trial Transcript P. 70, Lines 1-5). Mr. Roberts testified that while he, his family and his employees performed some clean up and restoration work themselves, nothing has been hired out to professionals because the Wax Museum does not have enough money to have all the necessary work done. While he testified as to what he made per hour as a pharmacist, he did not provide any

---

[12] Mr. Jones provided separate estimates for: Back Storage/Staging area, Back Hall, Obama Exhibit, Main Attraction 1st Floor, West Hall, Pirate Display, Female Restroom, Male Restroom, Display Exit, Basement, Gift Shop, Office, Break Room, Electrical/Air Closet, Ticket Office, Gift Storage, Front Shirt Storage Room, Rear Shirt Storage Room and Exterior.

evidence of how much time or money he spent making necessary repairs or how much, if any, future repairs he intends to make. The Wax Museum continues operating as a tourist attraction, and Plaintiffs have not made a claim for loss of profits due to the flooding damage.   While Mr. Jones estimated the loss to the building to be $188,854.23   (including $23,270.00 to repair an escalator that allegedly worked before the flooding), the only evidence produced as to the *proximate* value of the building and materials prior to the overflow was provided by Mr. Jones[13].   Mr. Jones estimated the actual cash value of the repairs to the building, not including his commission, to be $162,722.18. Under Arkansas law, the applicable measure of damages was the reasonable expense of necessary repairs to the property. *See* AMI 3d 2213; *Morton v. Park View* Apartments, 315 Ark. 400 (1993). The Court finds that many of Plaintiffs' claims for compensatory damages are unsupported by the evidence and should be reduced by 87.5%.   The Court finds that a reasonable value for damages caused to the building is $20,340.27.

Contents

With respect to the contents of the Wax Museum, Mr. Jones catalogued all of Plaintiffs' retail inventory, t-shirt inventory, damaged attractions and business operation furniture

---

[13] Mr. Jones testified that his commission is calculated based on his estimate of what he determines the total damage claim to be.   (Trial Transcript P. 217, Lines 3-6).

and equipment.   Inventory that was not damaged was stored offsite during clean-up.   Mr. Jones estimated the replacement cost of the contents to be $140,953.87. After adding his eight percent commission ($11,276.31) and then applying depreciation of $5,795.86, the actual cash value of the loss, including Mr. Jones' fee, was calculated to be $146,434.32.

Mr. Jones' analysis of the contents of the Wax Museum constitutes 30 pages of his report, with an additional 23 pages of photographs.  (Plaintiffs' Ex. 29, Pgs 24-54, 90-113).  Mr. Jones testified that he spent three to four days inventorying Plaintiffs' personal property.  (Trial Transcript P. 195, Ex. 3-4). He hand-counted every souvenir in the gift shop and storage area, leaving out any item that did not appear to be affected by the water.  (Trial Transcript P. 195, Lines 17-25).  Items such as glassware and t-shirts, which could arguably be cleaned, were not assigned salvage value, because it was Mr. Jones' understanding from Mr. Roberts that he did not intend to retain these items for resale.  (Trial Transcript P. 218, Lines 23-25; P. 219, Lines 1-14).  Mr. Jones testified, however, that because Mr. Roberts did not request a salvage audit, he does not know whether or how many of the items were disposed of.  (Trial Transcript P. 219, Lines 17-24).  Mr. Roberts testified that many items counted by Mr. Jones sat in the Wax Museum for about two months.  "Most of the stuff, the t-shirts, you know, we used

them at the Duck Shop[14] to mop up grease." (Trial Transcript P. 340, Lines 3-6). "The glassware was hauled to the dumpster at All Seasons Lodge. Some of my employees I'm sure took some of it in their vehicles throughout the period it sat there." (Trial Transcript P. 340, Lines 10-12). Mr. Roberts advised his employees not to sell the items they took, but he did not receive any payment from his employees for what they took. (Trial Transcript P. 340, Lines 14-21). The employees carried merchandise to two different dumpsters. Mr. Roberts told them to "just get rid of it," but he "can't say that they didn't take it home." (Trial Transcript P. 341, Lines 11-16).

Mr. Roberts continued to testify to Mr. Jones' breakdown of equipment and inventory, noting that most of the damaged office furniture remained in the Wax Museum three years after the overflow. Much of the equipment is still in use, some of which has been repaired[15]. It was not replaced because Plaintiffs did not have the money. (Trial Transcript P. 347, Line 20). Plaintiffs rented two local hotel rooms for one month to store property during the clean-up period, at a cost of $1016.00. (Plaintiffs' Ex. P. 25). In the gift shop, Plaintiffs cleaned the candle displays, which are currently in use. They brought

---

[14] Plaintiffs also own National Park Duck Tours, located at 418 Central Avenue in Hot Springs, Arkansas.
[15] Office desk:  currently in use; printer:  replaced with cheaper model; desk: "not sure"; legal chair:  on site; wooden chair: "not sure"; vertical cabinets:  on site; drink cooler:  repaired and in use. (Trial Transcript Pgs 345-347).

jewelry displays from the Duck Shop to replace the water-damaged ones at the Wax Museum.  The commercial ice cream freezer was replaced, but the damaged one remained in storage.  A drink cooler was repaired, as was the classic penny press machine. Plaintiffs refurbished the love tester machine, and bought a new one as well ($1852.50).  The coin operated Indy Car Style Children's Ride ($4874) was scrapped, and the 10-foot lighted Christmas tree kept in storage was replaced, while the original one remains onsite.  The commercial freezer remains in the back of the Wax Museum; Mr. Roberts does not know if it still works or not as he has not tried to sell ice cream from it.  Two wet vac cleaners were destroyed, but Mr. Roberts did not indicate whether they were replaced.  A custom-made oversized Mickey Mouse[16] was soaked with mud and water.  Mr. Roberts testified he had intended to use it in a future Disney exhibit.  "I'm sure you could clean it....I'm not sure where it's at, though.  I just don't know if they threw it away or not."  (Trial Transcript P. 353, Lines 18-20).

     The focus of a Wax Museum is, of course, the wax figurines themselves.  According to Mr. Roberts, a Pinocchio figurine (made partially of wax) that had been stored in the back of the Wax Museum was found after the overflow to have fallen out of a

---

[16] The Mickey Mouse figurine is one of two made for the opening of Disney World, according to Mr. Robert's wife's aunt, who donated it to the Wax Museum.  (Trial Transcript P. 353, Lines 4-14).

chair and broken its neck. (Trial Transcript P. 343, Lines 5-11). Mr. Roberts testified that he was sure Pinocchio had not been broken prior to being washed over. (Trial Transcript P. 364, Lines 12-19). Because Plaintiffs owned a second Pinocchio, they did not replace the damaged one at an estimated cost of $11,500.00. Two wax figurines inherited from the previous owner had resided in a coffin-shaped crate since at least 2002, having never been opened. Mr. Jones' report estimated their replacement cost to be $40,750 apiece. (Plaintiffs' Ex. 29, P. 34). The crate was not opened until several weeks after the overflow, and no attempt was made to clean or repair them. (Trial Transcript P. 361, Lines 8-10).

While the calculations of all damages in this matter have concerned the Court, it is the valuation of damages to Plaintiffs' personal property that causes the most concern. It is not necessarily the complexity of these calculations which makes the ultimate question of damages suffered by Plaintiffs virtually impossible to determine, but the manner in which they were assessed by Mr. Jones. According to both Mr. Roberts and Mr. Jones, a great number of items from the retail store were hauled away, but there is no evidence that the property was destroyed or disposed of rather than retained by Plaintiffs' employees. Some of the damaged office furniture remains in use at the Wax Museum, but Mr. Roberts does not know what became of

some of the furniture. Similarly, Mr. Roberts does not know whether the ice cream freezer works, because he has not tried to use it since the overflow.  Probably the most speculative of damage estimates is that for replacement of the wax figurines that were damaged by mold.  Mr. Roberts testified he had never opened the storage crate when he bought the Wax Museum from the prior owners in 2002.  There is no evidence as to what condition the figures were in at the time of the sale or immediately prior to any water damage in 2009.  As stated above, Plaintiffs did not open the crates immediately after the overflow, instead waiting several weeks to assess the damage.   Defendant argues the cost of the Pinocchio figure ($10,120.00), office furniture ($3,883,35), jewelry display ($874.25), Mickey Mouse ($740.77) and wax figurines ($81,500) should be deducted from any award. (Doc. 25, P. 12).

When there has been a total loss of property such that there is no salvage value or no possibility of repair, the owner is entitled to recover the fair market value of the property immediately before the loss occurred. *Kanis v. Rogers,* 119 Ark. 120 (1915). However, when the property is not a total loss but is only damaged, the owner is entitled to recover the difference in the fair market value of the property immediately before and immediately after the damage occurred. *Daughhetee v. Shipley*, 282 Ark. 596 (1984).  In both situations, the fair market value

is defined as the price the property would bring between a willing seller and a willing buyer in the open market after negotiations. *Southern Bus Co. v. Simpson,* 214 Ark. 323 (1948). When the property that has been damaged is clothing, home appliances, or other personal items, the measure of damages is not the fair market value but simply the fair value. *Howard's Laundry & Cleaners v. Brown,* 266 Ark. 460 (1979); *Cecil v. Headley,* 237 Ark. 400 (1963). Fair value is determined not by considering the saleable or second-hand value, but by considering the reasonable value to the owner for his own use, which includes considerations of original cost, replacement cost, and the owner's past and future use of the items. *Howard's Laundry, supra; Minerva Enterprises Inc. v. Howlett* 308 Ark. 291 (1992).

The Court finds many of Plaintiffs' claims for compensatory damages are unsupported by the evidence and should be reduced by 87.5%. The Court finds a reasonable value for the replacement cost of damaged contents is $16,894.75.

Mr. Jones' Adjustor Fee

Assuming an eight percent commission is reasonable for a private adjustor, the Court finds it is unreasonable for Mr. Jones to add $16,190.51 to the total damage assessment. Mr. Jones took an existing estimate from B&F Engineers for $202,381.43 to remediate the property behind the Wax Museum. He

then added his eight percent commission to that estimate by transferring B&F's line items to his adjustment and calling it an "Engineer Estimate Adjuster Fee."    The description of the fee states that it includes "Commission%, Retainage%, Outsourcing Expenses incurred from B&F Engineering, Consultations and all other applicable burdens." (Plaintiffs'. Ex. 29, P. 26).   In the absence of evidence that any of these fees and burdens actually existed, the Court finds that the United States is not liable for any commission on B&F's estimate.

Mr. Jones' commission on the building repair estimate (not including B&F's remediation efforts) is reduced to $1,627.22, proportional to the costs for repair allowed by the Court.

With respect to Mr. Jones' commission on the value of the contents of the Wax Museum, $11,276.31, for the reasons stated above, the Court finds that commission to be based on inflated valuation and speculative damages.   Defendant argues it should not be liable for any of the costs of this "expert", as the FTCA only provides for the recovery of compensatory damages. (Doc. 25, P. 11).   Given the amount of time and work Mr. Jones expended in assessing the damage to the Wax Museum and its contents and his degree of expertise in the industry, the Court finds the United States is liable for $1,351.58, which is 8% of the allowable award of $16,894.75.

Overhead and Profit

When Mr. Jones calculated the loss and cost of repair to the building and property, he allowed for twenty percent overhead and profit for the contractors.  Mr. Jones calculated the twenty percent based on the total "repair item totals", which included his eight percent commission.  Defendant is not liable for any overhead or profit added to Mr. Jones' commission.

The estimate that B&F Engineers provided to Plaintiffs was to remediate the collapsed soil material directly behind the Wax Museum as well as to stabilize the slope of the embankment and the concrete slab at the top of the embankment.  The estimate provided for material excavation, engineering and surveying fees, labor costs, insurance and bonding, gravel surface work, seeding, mulching, fertilizing and watering, safety systems, control, stabilization of upper concrete slab, retaining wall and labor, mobilization, traffic control, cleanup, testing and "miscellaneous."  Mr. Jones based his commission on the higher of the two B&F bids, $202,381.43.  Presumably, when B&F presented its report to Plaintiffs, including this estimate, they accounted for overhead and profit on their own work.  It was unreasonable, then, for Mr. Jones to add another twenty percent to the estimate. Defendant argues that all of the overhead and profit estimate ($77,114.74) should be deducted

from any award of damages because Mr. Roberts testified Plaintiffs did not expend this amount.    (Doc. 25, P. 12). Defendant is not liable for the cost attributable to overhead and profit allowances on the B&F estimate ($40,476.29).    The Court awards $4068.05.

## Conclusion

Based upon the foregoing, the Court concludes Plaintiffs have proven Defendant negligently maintained its underground storm drain system, causing damage to Plaintiffs' property. Accordingly, judgment is for Plaintiffs and Defendant is liable in the amount of $145,472.60, plus post-judgment interest at the rate of .19%.    Each party is to bear its own costs and fees.


IT IS SO ORDERED this 21st day of August, 2012.


/s/ Robert T. Dawson
Honorable Robert T. Dawson
United States District Judge